**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

───────────────

**No. 22-1127**

───────────────

IN RE: BESTWALL LLC,

        Debtor.

─────────────────────────────────────────────

BESTWALL LLC; GEORGIA-PACIFIC LLC,

        Plaintiffs – Appellees,

    v.

OFFICIAL COMMITTEE OF ASBESTOS CLAIMANTS,

        Defendant – Appellant,

    and

SANDER L. ESSERMAN, IN HIS CAPACITY AS FUTURE CLAIMS REPRESENTATIVE; THOSE PARTIES LISTED ON APPENDIX A TO COMPLAINT; JOHN AND JANE DOES 1-1000,

        Defendants.

───────────────

**No. 22-1135**

───────────────

IN RE: BESTWALL LLC,

        Debtor.

_____

BESTWALL LLC; GEORGIA-PACIFIC LLC,

      Plaintiffs – Appellees,

    v.

SANDER L. ESSERMAN, IN HIS CAPACITY AS FUTURE CLAIMANTS REPRESENTATIVE,

      Defendant – Appellant,

    and

OFFICIAL COMMITTEE OF ASBESTOS CLAIMANTS OF BESTWALL, LLC; CLAIMANTS OF BRAYTON PURCELL, LLP; CLAIMANTS OF LAW OFFICES OF PETER G. ANGELOS, P.C.; CLAIMANTS OF WEITZ & LUXENBERG, P.C.; CLAIMANTS OF NASS CANCELLIERE; CLAIMANTS OF REBECCA S. VINOCUR, P.A.; CLAIMANTS OF THE DEATON LAW FIRM; CLAIMANTS OF O'BRIEN LAW FIRM, P.C.; CLAIMANTS OF BEVAN AND ASSOCIATES LPA, INC.; CLAIMANTS OF WILENTZ, GOLDMAN & SPITZER, P.A.; CLAIMANTS OF THE FERRARO LAW FIRM, PA; CLAIMANTS OF SHEPARD LAW, P.C.; CLAIMANTS OF SHRADER & ASSOCIATES, L.L.P.; CLAIMANTS OF SWMW LAW, LLC AND ERNEST J. FOUCHA; CLAIMANTS OF WATERS & KRAUS, LLP LISTED; CLAIMANTS OF LEVY KONIGSBERG, LLP; CLAIMANTS OF FLINT LAW FIRM, LLC; CLAIMANTS OF MAUNE, RAICHLE, HARTLEY, FRENCH & MUDD, LLC; CLAIMANTS OF COHEN PLACITELLA & ROTH P.C.; CLAIMANTS OF THE LANIER LAW FIRM, PC; CLAIMANTS OF KELLER FISHBACK & JACKSON, LLP; CLAIMANTS OF KAZAN, MCCLAIN, SATTERLEY & GREENWOOD; CLAIMANTS OF GORI JULIAN & ASSOCIATES, P.C.; CLAIMANTS OF SAVINIS KANE & GALLUCI, LLC AND PRIM LAW FIRM, PLLC; CLAIMANTS OF COONEY AND CONWAY; CLAIMANTS OF BUCK LAW FIRM; CLAIMANTS OF NEMEROFF LAW FIRM, PC; CLAIMANTS OF MICHAEL B. SERLING, P.C.; CLAIMANTS OF KELLEY & FERRARO LLP; CLAIMANTS OF THORNTON LAW FIRM; CLAIMANTS OF BAILEY PEAVY BAILEY COWAN HECKAMAN PLLC; CLAIMANTS OF WALLACE & GRAHAM, P.A., listed on appendix A to the complaint,

      Defendants.

_____

Appeal from the United States District Court for the Western District of North Carolina, at Charlotte. Robert J. Conrad, Jr., District Judge. (3:20-cv-00103-RJC)

———————————

Argued: December 6, 2022                    Decided: June 20, 2023

———————————

Before KING and AGEE, Circuit Judges, and Henry E. HUDSON, Senior United States District Judge for the Eastern District of Virginia, sitting by designation.

———————————

Affirmed by published opinion. Judge Agee wrote the opinion in which Judge Hudson joined. Judge King wrote an opinion dissenting in part.

———————————

**ARGUED:** Natalie Diane Ramsey, ROBINSON & COLE, LLP, Wilmington, Delaware; Edwin J. Harron, YOUNG, CONAWAY, STARGATT & TAYLOR LLP, Wilmington, Delaware, for Appellants. Noel John Francisco, JONES DAY, Washington, D.C., for Appellees. **ON BRIEF:** Davis L. Wright, Wilmington, Delaware, Thomas J. Donlon, ROBINSON & COLE LLP, Stanford, Connecticut; Mark R. Kutny, HAMILTON, STEPHENS, STEELE & MARTIN, PLLC, Charlotte, North Carolina, for Appellant Official Committee of Asbestos Claimants. Sharon J. Zieg, Travis G. Buchanan, YOUNG, CONAWAY, STARGATT & TAYLOR LLP, Wilmington, Delaware; Felton E. Parrish, John M. Spencer, ALEXANDER RICKS, PLLC, Charlotte, North Carolina, for Appellant Sandler L. Esserman. Gregory M. Gordon, Dallas, Texas, C. Kevin Marshall, Megan Lacy Owen, JONES DAY, Washington, D.C.; Garland S. Cassada, Richard C. Worf, Jr., ROBINSON, BRADSHAW & HINSON, P.A., Charlotte, North Carolina, for Appellee Bestwall LLC. Mark P. Goodman, M. Natasha Labovitz, DEBEVOISE & PLIMPTON LLP, New York, New York; Ross R. Fulton, John R. Miller, Jr., RAYBURN COOPER & DURHAM, P.A., Charlotte, North Carolina, for Appellee Georgia-Pacific LLC.

———————————

AGEE, Circuit Judge:

The district court affirmed a bankruptcy court order that entered a preliminary injunction preventing thousands of third-party asbestos claims from proceeding against debtor Bestwall LLC's affiliates, including affiliate and non-debtor Georgia-Pacific LLC ("New GP"). The Official Committee of Asbestos Claimants ("Committee") and Sander L. Esserman, in his capacity as Future Claimants' Representative ("FCR") (collectively "Claimant Representatives"), appeal. They argue that the bankruptcy court lacked jurisdiction to enjoin non-bankruptcy proceedings against New GP and, alternatively, that the bankruptcy court erred in entering the preliminary injunction because it applied an improper standard.

As explained below, based on the specific facts of this case, we agree with the district court that the bankruptcy court had "related to" jurisdiction to issue the preliminary injunction and applied the correct standard in doing so. Accordingly, we affirm the judgment of the district court.

I.

Georgia-Pacific LLC ("Old GP"), the corporate parent and predecessor of New GP and Bestwall, merged with Bestwall Gypsum Company ("Old Bestwall"), a manufacturer of asbestos-containing products, in 1965. Old GP then sold those products until 1977. Commencing in or before 1979, Old GP has faced thousands of asbestos-related personal-injury lawsuits based on its sale of those products.

4

In 2017, Old GP underwent a divisional merger under Texas law.[1] *See* Tex. Bus. Orgs. Code § 1.002(55)(A); *see also In re LTL Mgmt., LLC*, 64 F.4th 84, 96 (3d Cir. 2023) (explaining that such a "merger splits a legal entity into two, divides its assets and liabilities between the two new entities, and terminates the original entity"). As a result of this restructuring, Old GP ceased to exist, and its assets and liabilities were divided between two new entities as wholly owned subsidiaries of Georgia-Pacific Holdings, LLC: Bestwall and New GP. The purpose of this restructuring was twofold:

> (a) to separate and align [Old GP's] business of managing and defending asbestos-related claims with the assets and team of individuals primarily related to or responsible for such claims; and (b) to provide additional optionality regarding potential alternatives for addressing those claims in the future, including through the commencement of a chapter 11 reorganization proceeding to utilize section 524(g) of the Bankruptcy Code without subjecting the entire Old GP enterprise to chapter 11.

J.A. 591.

In accordance with this purpose, Bestwall received certain of Old GP's assets[2] and

---

[1] The corporate-law validity of this restructuring is not at issue.

[2] The assets Bestwall received included, among other things, approximately $32 million in cash; all contracts of Old GP related to its asbestos litigation, such as settlement agreements, insurance policies, and engagement contracts; a tract of land and a related long-term lease of that land to an affiliate; and the full 100 percent equity interest in GP Industrial Plasters LLC ("PlasterCo").

PlasterCo and its subsidiaries operate a profitable plasters business as a wholly owned subsidiary of Bestwall. They "develop[], manufacture[], sell[] and distribute[] gypsum plaster products," including, *e.g.*, industrial plaster, medical plaster, pottery plaster, and general purpose plaster, and utilize three facilities around the country for their business. J.A. 590. At the time Bestwall received the equity interest in PlasterCo, PlasterCo "was projected to generate approximately $14 million in EBITDA in 2018 and approximately $18 million in the years thereafter." J.A. 595. Further, as of the date of the bankruptcy petition, PlasterCo and its subsidiaries were valued at approximately $145 (Continued)

became solely responsible for certain of its liabilities, including all asbestos-related liabilities. As a result, Bestwall "ha[d] the same ability to fund asbestos claims that Old GP had." J.A. 595. New GP received all other assets of Old GP and became responsible for all other non-asbestos-related liabilities of Old GP.

Following the restructuring, asbestos claimants began naming New GP as a defendant in asbestos lawsuits even though Bestwall had taken on sole responsibility for asbestos claims and would process those claims in its bankruptcy proceeding (described below).

A.

As part of the restructuring of Old GP, Bestwall and New GP entered into a number of agreements between them.

First, in a plan of merger and merger support agreement, Bestwall and New GP agreed that:

> Bestwall will indemnify and hold harmless New GP from and against all Losses to which New GP may become subject, insofar as such Losses (or Proceedings in respect thereof) arise out of, in any way relate to, or result from . . . (a) a claim in respect of, any Bestwall Assets or Bestwall Liabilities or (b) reimbursement or other obligations of New GP under or in respect of any appeal bonds or similar litigation related surety Contracts that are or have been posted or entered into by New GP in connection with Proceedings in respect of any Bestwall Liabilities. New GP will indemnify and hold harmless Bestwall from and against all Losses to which Bestwall may become subject, insofar as such Losses (or Proceedings in respect thereof) arise out of, in any way relate to, or result from a claim in respect of, any New GP Assets or New GP Liabilities.

---

million. Therefore, although the dissent speculates that Bestwall has not "do[ne] much of anything" aside from filing for bankruptcy, *post* at 32, that characterization is not supported by the record. Since Bestwall's inception, its plaster subsidiary has operated a significant business available to contribute millions to the Bestwall bankruptcy estate.

J.A. 581; *see* J.A. 555.

In addition, the two companies entered into a funding agreement, which required New GP to cover expenses that Bestwall incurred in the normal course of its business and to fund Bestwall's obligations to New GP, including Bestwall's indemnification obligations as described above. Based on this funding agreement, "New GP's evidently bountiful assets"—while "out of reach" via the tort system, *post* at 32—will be and have been available to claimants through the Bestwall bankruptcy estate.

Upon Bestwall filing for bankruptcy, New GP's indemnification obligations included the costs of administering the bankruptcy and the costs of funding a § 524(g) asbestos trust.[3] However, New GP was required to fund the trust only to the extent that Bestwall's other assets were insufficient. Alternatively, if Bestwall did not file for bankruptcy, New GP was to provide any amounts necessary to satisfy Bestwall's asbestos liabilities. Overall, Bestwall was not required to repay New GP for such funding, and New GP was to provide funding only to the extent that Bestwall's subsidiaries' distributions were insufficient to cover Bestwall's costs and expenses (except as to the funding of the § 524(g) trust, as explained above). Thus, New GP's assets are available to the Bestwall bankruptcy estate to cover approved asbestos claims.

---

[3] Section 524(g) provides for the creation of a trust that, pursuant to a chapter 11 plan of reorganization, "is to assume the liabilities of a debtor which at the time of entry of the order for relief has been named as a defendant in personal injury, wrongful death, or property-damage actions seeking recovery for damages allegedly caused by the presence of, or exposure to, asbestos or asbestos-containing products." 11 U.S.C. § 524(g)(2)(B)(i)(I).

In addition, Bestwall and New GP entered into a secondment[4] agreement whereby New GP assigned some of its employees to Bestwall, including its in-house legal team that had managed the defense of the asbestos-related claims. Bestwall determined the amount of each seconded employee's time that it needed each month so that the employee could work for Bestwall's other affiliates in any remaining time. New GP was not permitted to recall any of the seconded employees from Bestwall without Bestwall's consent.

B.

Following the restructuring, Bestwall filed a voluntary petition for chapter 11 bankruptcy in the Western District of North Carolina. The goal of the bankruptcy was to:

> consummate a plan of reorganization that would . . . provide for (a) the creation and funding of a trust established under section 524(g) of the Bankruptcy Code to pay valid asbestos-related claims and (b) issuance of an injunction under section 524(g) of the Bankruptcy Code that will permanently protect [Bestwall] and its affiliates from any further asbestos claims arising from products manufactured and sold by, or operations or conduct of, Old Bestwall or Old GP.

J.A. 603.[5]

---

[4] "Secondment" refers to "[a] period of time that a worker spends away from his or her usual job, usu[ally] either doing another job or studying." *Secondment,* Black's Law Dictionary (11th ed. 2019).

[5] Section 524(g) provides the process by which a court that confirms a chapter 11 reorganization plan may issue a channeling injunction "to enjoin entities from taking legal action for the purpose of directly or indirectly collecting, recovering, or receiving payment or recovery with respect to any claim or demand that . . . is to be paid in whole or in part by a trust." 11 U.S.C. § 524(g)(1)(B). "[S]uch an injunction may bar any action directed against a third party who is identifiable from the terms of such injunction . . . and is alleged to be directly or indirectly liable for the conduct of, claims against, or demands on the debtor[.]" *Id.* § 524(g)(4)(A)(ii).

Bestwall also filed an adversary proceeding seeking a preliminary injunction under 11 U.S.C. § 105(a) enjoining any asbestos-related claims against New GP or, alternatively, a declaration that the automatic stay under § 362(a)[6] applied to such claims against New GP. Bestwall asserted that its requested relief was necessary to avoid defeating the essential purpose of the bankruptcy. Without such relief from the bankruptcy court, Bestwall contended that asbestos claimants would proceed against New GP for the same claims already in the Bestwall bankruptcy proceeding, thereby rendering the bankruptcy futile.

The bankruptcy court first determined that it had "related to" subject matter jurisdiction under 28 U.S.C. § 1334(b)[7] to enjoin the claims against New GP because allowing the claims against New GP to proceed outside of Bestwall's bankruptcy proceeding could detrimentally affect the Bestwall bankruptcy estate for at least three reasons.[8] *In re Bestwall LLC*, 606 B.R. 243, 249–51 (Bankr. W.D.N.C. 2019). First, the purpose of the bankruptcy would be defeated without the injunction because Bestwall

---

[6] In relevant part, this section provides that when a voluntary petition for bankruptcy is filed under chapter 11, all cases or claims against the debtor are automatically stayed. 11 U.S.C. § 362(a). The bankruptcy court and the district court did not address whether the protections of the automatic stay extended to the asbestos-related claims against New GP, so we do not address that particular argument either.

[7] As explained below, the bankruptcy court has jurisdiction over civil proceedings "arising in or related to cases under title 11." 28 U.S.C. § 1334(b).

[8] The dissent claims the bankruptcy court failed to address whether Old GP, New GP, and Bestwall attempted to manufacture jurisdiction. But, in response to Claimant Representatives' jurisdictional argument that "[t]he parties cannot confer jurisdiction . . . through the artificial construct of the contractual indemnification provided to New GP" by Bestwall, J.A. 510, the bankruptcy court concluded that the indemnification obligations between Bestwall and New GP were not "contrived." *In re Bestwall*, 606 B.R. at 250.

would be unable to address all the claims against it in one forum. *Id.* at 249. Second, without the injunction, Bestwall's personnel would be forced to spend time defending the claims against New GP at the expense of performing tasks necessary to Bestwall's reorganization. *Id.* And third, Bestwall's indemnity obligations to New GP would "make judgments against [New GP] . . . tantamount to judgments against" the Bestwall bankruptcy estate. *Id.* at 250. The bankruptcy court also concluded that Bestwall met the requirements for the entry of a preliminary injunction in relevant part because it had a realistic possibility of a successful reorganization. *Id.* at 255.

C.

The Claimant Representatives appealed to the district court, which affirmed the judgment of the bankruptcy court. *In re Bestwall LLC*, No. 3:20-cv-105-RJC, 2022 WL 68763, at *1 (W.D.N.C. Jan. 6, 2022).[9] In doing so, the district court concluded that the FCR had standing to appeal the bankruptcy court's order because the FCR represents those parties who may become claimants during the pendency of the injunction and would thereby be enjoined from pursuing their as-yet-unfiled claims against New GP. *Id.* at *4. The court reasoned that this was "a direct and adverse effect on the future claimants['] pecuniary interests" and therefore sufficient to show standing. *Id.*

---

[9] The appeals by the Committee and the FCR were docketed under separate docket numbers, so the district court issued two separate orders affirming the bankruptcy court. Because the two separate orders mirror each other, we cite only the order from No. 3:20-cv-00105-RJC for simplicity.

10

Next, the district court determined that the bankruptcy court had "related to" jurisdiction based on (1) the purpose of Bestwall's reorganization—which would be defeated absent the injunction; (2) the distraction of Bestwall's personnel if they needed to assist in defending litigation against New GP while also trying to pursue Bestwall's reorganization; and (3) the impact of the indemnification obligations between Bestwall and New GP on the Bestwall bankruptcy estate. *Id.* at *5–6.

Lastly, the district court found that the bankruptcy court did not abuse its discretion in granting the preliminary injunction. *Id.* at *7. Relevant to this appeal, when analyzing the likelihood-of-success element, the district court rejected Claimant Representatives' argument that the bankruptcy court applied the incorrect legal standard. It further reasoned that based on Bestwall's significant assets and contractual rights under the funding agreement, the bankruptcy court did not abuse its discretion in concluding that Bestwall had a reasonable likelihood of a successful reorganization. *Id.* at *8.

On appeal, the parties dispute appellate standing, subject matter jurisdiction, and the merits of the preliminary injunction. We analyze each argument in turn. We have jurisdiction under 28 U.S.C. § 158(d) and § 1291.

II.

11

We begin with Bestwall's threshold argument that the district court erred in finding that the FCR had appellate standing.[10] The presence of appellate standing is a legal conclusion that we review de novo. *See Mort Ranta v. Gorman*, 721 F.3d 241, 250 (4th Cir. 2013) (explaining that when this Court reviews a decision by a district court operating as a bankruptcy appellate court, the Court reviews legal conclusions de novo); *see also LaTele Television, C.A. v. Telemundo Commc'ns Grp., LLC*, 9 F.4th 1349, 1357 (11th Cir. 2021) (explaining that determinations regarding appellate standing are reviewed de novo).

The test for standing to appeal a bankruptcy court's order is whether the party is a "person aggrieved" by the order, *In re Urb. Broad. Corp.*, 401 F.3d 236, 243 (4th Cir. 2005), meaning that the party is "directly and adversely affected pecuniarily," *id.* at 244 (quoting *In re Clark*, 927 F.2d 793, 795 (4th Cir. 1991)); *see In re Imerys Talc Am., Inc.*, 38 F.4th 361, 371 (3d Cir. 2022) (explaining that "parties meet that standard only when a contested order 'diminishes their property, increases their burdens, or impairs their rights'" (citation omitted)).

We conclude that in this case, the district court properly found that the FCR had standing to challenge the bankruptcy court's order on appeal. As the district court reasoned, the FCR represents individuals who may become claimants during the pendency of the injunction and will be enjoined from litigating their asbestos-related claims outside of Bestwall's bankruptcy. The injunction thus "increases [the future claimants'] burdens" and

---

[10] We can consider this argument although Bestwall did not file a cross-appeal because Bestwall does not seek to alter the district court's judgment. *See Mayor of Balt. v. Azar*, 973 F.3d 258, 295 (4th Cir. 2020).

12

"impairs their rights," *In re Imerys Talc Am.*, 38 F.4th at 371 (citation omitted), such that they are directly and adversely affected by the bankruptcy court's entry of the preliminary injunction. *See In re Amatex Corp.*, 755 F.2d 1034, 1041 (3d Cir. 1985) (explaining that future claimants "clearly have a practical stake in the outcome of the [bankruptcy] proceedings"); *id.* at 1043 (stating that bankruptcy proceedings "will vitally affect [future claimants'] interests").[11]

## III.

Next, we turn to the Claimant Representatives' argument that the bankruptcy court lacked jurisdiction to enjoin the asbestos litigation against New GP. They assert that (1) the bankruptcy court lacked "related to" jurisdiction to enter the preliminary injunction, and (2) Old GP attempted to improperly manufacture jurisdiction. Whether the court has subject matter jurisdiction is a legal question that we review de novo. *New Horizon of NY LLC v. Jacobs*, 231 F.3d 143, 150 (4th Cir. 2000).

## A.

Under 28 U.S.C. § 1334(b), a bankruptcy court has jurisdiction over civil proceedings "arising in or related to cases under title 11." This Court follows the broad test for "related to" jurisdiction first articulated by the Third Circuit in *Pacor, Inc. v. Higgins*,

---

[11] The district court also briefly addressed Fourth Circuit case law indicating that a party without a pecuniary interest in a case can have appellate standing arising from that party's "official duty to enforce the bankruptcy law in the public interest." *In re Bestwall*, 2022 WL 68763, at *4 (citing *In re Clark*, 927 F.2d at 796). However, the district court did not base its finding of standing on this precedent, and we need not address it in light of our conclusion above.

743 F.2d 984, 994 (3d Cir. 1984), *overruled in part on other grounds by Things Remembered, Inc. v. Petrarca*, 516 U.S. 124 (1995). *See A.H. Robins Co. v. Piccinin*, 788 F.2d 994, 1002 n.11 (4th Cir. 1986) (adopting *Pacor* test). Under *Pacor*, a civil proceeding is "related to" a bankruptcy case if "the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy." 743 F.2d at 994 (cleaned up). In other words, if the outcome of the proceeding "could alter the debtor's rights, liabilities, options, or freedom of action (either positively or negatively) and . . . in any way impacts upon the handling and administration of the bankrupt estate," the bankruptcy court has "related to" jurisdiction. *Id.* This "test does not require certain or likely alteration of the debtor's rights, liabilities, options or freedom of action, nor does it require certain or likely impact upon the handling and administration of the bankruptcy estate." *In re Celotex Corp.*, 124 F.3d 619, 626 (4th Cir. 1997). Instead, "[t]he possibility of such alteration or impact is sufficient to confer jurisdiction." *Id.*

As the bankruptcy court correctly determined, the asbestos-related claims against Bestwall are identical to the claims against New GP pending now or likely to be pending in the future in the various state courts. *See In re Bestwall*, 606 B.R. at 251 ("The liability being asserted against New GP and Bestwall would be identical and co-extensive in every respect."). The Committee's counsel admitted that litigating the *same claims* in thousands of state-court cases, that will also be resolved within the Bestwall bankruptcy case, could

have an effect on the Bestwall bankruptcy estate.[12] *See* Oral Argument at 16:25-17:06 (acknowledging that it was "broadly . . . true" that litigating the exact same claims in state courts and in bankruptcy court would affect what happens in the bankruptcy). And the possible effect on the Bestwall bankruptcy estate of litigating thousands of identical claims in state court is sufficient to confer "related to" jurisdiction. *See Piccinin*, 788 F.2d at 1004, 1007 (relying on "persuasive guidance" from a bankruptcy court decision that reasoned that an injunction could be extended to litigation against non-debtors where the covered actions were "inextricably interwoven with the debtor" (quoting *In re Johns-Manville Corp.*, 26 B.R. 405, 418 (Bankr. S.D.N.Y. 1983))); *In re Dow Corning Corp.*, 86 F.3d 482, 493 (6th Cir. 1996) (finding "related to" jurisdiction over claims pending against non-debtor defendants because the debtor and the non-debtor defendants "are closely related with regard to the pending . . . litigation").

For example, if New GP were found liable for asbestos-related claims in the state-court cases, that could reduce the claimants' recovery on those claims in the bankruptcy proceeding, thereby reducing the amount of money that would be paid out of the bankruptcy estate and leaving more funds in the estate for other claimants. *See* Oral Argument at 2:55–4:17 (the Committee's counsel admitting that "there's obviously only one recovery, but . . . the plaintiffs have the right to pursue multiple sources for

---

[12] There could also be asbestos-related cases against New GP pending now or in the future in federal courts based on diversity jurisdiction or otherwise. The same reasoning and rule apply to any of those cases just as they do to state-court cases. We simply use "state-court cases" as a comprehensive generic phrase referring to all asbestos-related claims pending against New GP outside of the Bestwall bankruptcy proceedings.

reimbursement"); *see also In re Celotex Corp.*, 124 F.3d at 626 (indicating that "related to" jurisdiction exists if the proceeding *could* alter the debtor's liabilities positively or negatively). Furthermore, issue preclusion, inconsistent liability, and evidentiary issues could well arise in the bankruptcy proceeding based on the results of the state-court litigation against New GP, and the resolution of those issues would inevitably affect the bankruptcy estate. *See Piccinin*, 788 F.2d at 1005, 1007 (describing as "persuasive guidance" a bankruptcy case in which the court granted an injunction against lawsuits against non-debtors in part due to collateral estoppel concerns (citing *In re Johns-Manville Corp.*, 26 B.R. at 435)).

Therefore, we agree with the district court that the bankruptcy court properly concluded that it had "related to" jurisdiction to enjoin the claims against New GP.[13] We

---

[13] Separately, we observe that the indemnification and secondment obligations—which provide for the transfer of funds and personnel between entities—would also likely have a cognizable effect on the Bestwall bankruptcy estate in the absence of the injunctive relief.

For example, based on the indemnification obligations, if the asbestos-related litigation against New GP continues during the pendency of Bestwall's bankruptcy, and New GP sustains losses, the Bestwall bankruptcy estate would be required to indemnify New GP, but without any adjudication of those same claims otherwise pending before the bankruptcy court. New GP would step in to provide funds to cover the indemnification only if Bestwall's subsidiaries' distributions were insufficient to cover its obligations. It is difficult to see how this exchange of money with a debtor could *not* conceivably affect the bankruptcy estate. And if New GP provided funds to Bestwall to pay for Bestwall's indemnification of New GP—as the dissent speculates is likely to happen—that would clearly alter Bestwall's liabilities and thereby impact how the bankruptcy estate is handled. *See Pacor*, 743 F.2d at 994. (Also, while the dissent relies on an allegation in the briefing that New GP has provided Bestwall with $150 million under the funding agreement, the parties do not point to any record evidence supporting that statement. *See I.N.S. v. Phinpathya*, 464 U.S. 183, 188 n.6 (1984) (explaining that unsupported assertions in briefing are not evidence).)
(Continued)

16

emphasize that this conclusion is based on the specific circumstances of this case, including the involvement of thousands of identical claims against New GP and Bestwall and the fact that the claims against New GP are, or could be, pending in many state courts around the country.[14]

B.

Our conclusion concerning "related to" jurisdiction does not end the jurisdictional analysis. The Claimant Representatives also assert that Old GP impermissibly sought to manufacture jurisdiction in the bankruptcy court which could prevent this Court from

---

Similarly, as to the secondment agreement, if litigation were permitted to continue against New GP and Bestwall assented to its employees leaving to assist New GP, as the dissent imagines will occur, those employees would likely have to spend significant time managing the defense of the claims against New GP such that the handling and administration of Bestwall's bankruptcy estate and Bestwall's rights and liabilities in bankruptcy would be affected.

And if—as the Claimant Representatives assert—Bestwall refused to so assent and retained its employees, New GP would have to find and train new employees to assist in managing its defense in the litigation, and Bestwall's estate could thereby be affected by adverse judgments against New GP that would implicate Bestwall's indemnity obligations or liability through collateral estoppel. Further, if New GP retained new employees to assist in its defense, Bestwall would have to indemnify New GP for the expenses associated with those employees, which would further deplete the bankruptcy estate. *See* J.A. 581 ("Bestwall will indemnify and hold harmless New GP from and against all Losses to which New GP may become subject, insofar as such Losses . . . arise out of, in any way relate to, or result from a claim in respect of, any Bestwall Assets or Bestwall Liabilities[.]"); J.A. 559 (defining "Losses" to include "costs and expenses, including reasonable attorneys' fees"). Therefore, under either scenario, the operation of the secondment agreement could impact the bankruptcy estate.

[14] Because we conclude that the bankruptcy court had "related to" jurisdiction over the claims against New GP, we need not consider whether the bankruptcy court separately possessed "arising in" jurisdiction.

exercising "related to" jurisdiction. We disagree with the Claimant Representatives' argument and the dissent's acceptance of that argument.

Under 28 U.S.C. § 1359, federal courts do not have jurisdiction over civil actions "in which any party, by assignment or otherwise, has been improperly or collusively made or joined to invoke the jurisdiction of such court." We have found this statute violated when a nominal party has no real stake in the outcome of a case such that the only possible reason for its involvement is to create jurisdiction. *See Lester v. McFaddon*, 415 F.2d 1101, 1106 & n.11 (4th Cir. 1969) ("It is the lack of a stake in the outcome coupled with the motive to bring into a federal court a local action normally triable only in a state court which is the common thread of the cases holding actions collusively or improperly brought."). For example, we found § 1359 violated when a South Carolina citizen procured the appointment of a Georgia citizen as administrator of an estate seemingly to create diversity jurisdiction.[15] *See id.* at 1103–04 (noting that the dispute was "superficially converted into a dispute between citizens of different states" because the appointed administrator had no stake in the litigation, likely would not play a role, and was clearly a "straw party . . . appoint[ed] for the purpose of creating apparent diversity of citizenship" (internal quotation marks omitted)); *see also Kramer v. Caribbean Mills, Inc.*, 394 U.S. 823, 827–28 (1969) (finding that a party improperly manufactured jurisdiction where he "total[ly] lack[ed] [a]

---

[15] Bestwall and New GP argue that § 1359 only applies in suits based on diversity jurisdiction. Although neither the statute itself nor case law interpreting it suggests such a limitation, we need not decide this issue because assuming the statute applies in the bankruptcy context, it does not apply to this case.

previous connection with the matter" and "candidly admit[ted] that the assignment was in substantial part motivated by a desire . . . to make diversity jurisdiction available" (internal quotation marks omitted)); *Lehigh Mining & Mfg. Co. v. Kelly*, 160 U.S. 327, 339 (1895) (affirming dismissal based on lack of jurisdiction—prior to the enactment of § 1359— where a Virginia corporation created a Pennsylvania corporation and conveyed to it land "for the express purpose" of enabling the Pennsylvania corporation to file suit in federal court against Virginia residents based on diversity jurisdiction).

Separate from § 1359, we have held that "neither the parties nor the bankruptcy court can create § 1334 jurisdiction." *Valley Historic Ltd. P'ship v. Bank of N.Y.*, 486 F.3d 831, 837 (4th Cir. 2007); *see Orquera v. Ashcroft*, 357 F.3d 413, 416 (4th Cir. 2003) (indicating that parties cannot create subject matter jurisdiction). For example, parties cannot include a provision in a plan of reorganization purporting to confer jurisdiction on a bankruptcy court because "the Debtor cannot write its own jurisdictional ticket." *Valley Historic*, 486 F.3d at 837 (cleaned up).

But unlike the cases referenced above, Old GP, New GP, and Bestwall did not manufacture jurisdiction via their Texas divisional merger. This is evident because without the restructuring, the asbestos claims would have remained with Old GP. And, if Old GP had filed for bankruptcy, the bankruptcy court would have had jurisdiction over those claims as it does over the same claims here. *See* 28 U.S.C. § 1334(b) (providing for bankruptcy court jurisdiction over civil proceedings "related to" cases under title 11); *Valley Historic*, 486 F.3d at 836 (explaining that "related to" jurisdiction is implicated if a civil action could alter the debtor's rights and liabilities and impacts the administration of

19

the bankruptcy estate). Thus, as Bestwall and New GP point out, "the corporate restructuring leaves the jurisdictional result the *same*." Resp. Br. 40; *see U.S.I. Props. Corp. v. M.D. Constr. Co.*, 860 F.2d 1, 6 (1st Cir. 1988) ("[P]arties may legitimately try to obtain the jurisdiction of federal courts, as long as they lawfully qualify under some of the grounds that allow access to this forum of limited jurisdiction. On the other hand, using a strawman, or sham transactions, solely for the creation of otherwise *unobtainable jurisdiction*, is clearly forbidden both by statute and by the policies that underlie diversity jurisdiction." (emphasis added)). This distinction differentiates the present circumstances from the cases on which Claimant Representatives rely and precludes the application of § 1359.

The dissent contends that we "miss[] the point" by "focusing on jurisdiction over claims instead of parties." *Post* at 43. But there is no way to separate the parties from the claims here and, even if there were, we would decline to do so because § 1334(b) requires us to analyze whether the *claims* involving New GP are "related to" the bankruptcy case. *See* 28 U.S.C. § 1334(b) ("[T]he district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11."); *see also Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 431 (2007) (explaining that subject matter jurisdiction is "jurisdiction over the category of claim in suit" as compared to personal jurisdiction, which is jurisdiction over the parties). The statute does not instruct us to consider the parties in isolation.

A recent Third Circuit decision that involved a divisional merger followed by the bankruptcy of one of the parties does not affect the manufactured-jurisdiction analysis. In

*In re LTL Management, LLC*, 64 F.4th 84 (3d Cir. 2023), that court was confronted with a restructuring similar to Old GP's divisional merger—namely, a corporation undergoing a divisional merger pursuant to Texas law in order to isolate its asbestos-related liabilities in one subsidiary and its "productive business assets" in another subsidiary. *Id.* at 93. Following the restructuring, the asbestos-related subsidiary filed for bankruptcy, and the claimants moved to dismiss the bankruptcy petition as not filed in good faith. *Id.* The bankruptcy court denied the motion, but the Third Circuit reversed and dismissed the bankruptcy petition under 11 U.S.C. § 1112(b). *Id.* at 93, 111. The appellate court held that the debtor was not in financial distress and the bankruptcy petition therefore was not filed in good faith. *Id.* at 106, 109–10.

In this appeal, by contrast, Claimant Representatives do not make the arguments raised by the claimants in *LTL Management*. They do not contend that Bestwall was not in financial distress when it filed for bankruptcy, nor does this appeal involve a motion to dismiss filed on that basis. Further, as the Third Circuit recognized in *LTL Management*, this Court applies a more comprehensive standard to a request for dismissal of a bankruptcy petition for lack of good faith; that is, the complaining party must show both "subjective bad faith" and the "objective futility of any possible reorganization." *Id.* at 98 n.8 (quoting *Carolin Corp. v. Miller*, 886 F.2d 693, 694 (4th Cir. 1989)). The Claimant Representatives have made no showing to this Court of either required element.

As importantly, the court in *LTL Management* did not address the critical issue present here: whether the bankruptcy court had jurisdiction to enter a preliminary injunction. *See id.* at 99 n.11 ("The parties contest whether the Bankruptcy Court had

jurisdiction to issue the order enjoining the Third-Party Claims against the Protected Parties. Dismissing LTL's petition obviates the need to reach that question."). *LTL Management* is simply not relevant to the resolution of the case before us.

Moreover, while Claimant Representatives assert that Old GP's restructuring caused Bestwall and New GP to enter into the indemnification and funding agreements for the sole purpose of creating jurisdiction over the claims against New GP, this argument is a non-starter because our finding of jurisdiction is not predicated on those agreements. Rather, it is based on the thousands of identical claims pending against New GP outside of the bankruptcy proceeding and the effect of those claims on Bestwall's bankruptcy estate, which Old GP clearly could not and did not manufacture.

Finally, the dissent argues that Bestwall was obligated—but failed—to prove that the restructuring was "driven by an independent, legitimate business justification" rather than being pretextual. *Post* at 40. Assuming without deciding that such a showing is necessary, Bestwall did make that showing. The record establishes that the restructuring was driven by Old GP's desire to pursue its non-asbestos-related business apart from asbestos-related litigation or a bankruptcy proceeding while keeping its assets available to satisfy any asbestos-related liabilities, if required. *See, e.g.*, J.A. 591 ¶ 13 (explaining that the purpose of the restructuring was "to separate and align [Old GP's] business of managing and defending asbestos-related claims with the assets and team of individuals primarily related to or responsible for such claims"; to provide options for addressing those claims "without subjecting the entire Old GP enterprise to chapter 11"; and "to make

certain that [Bestwall] had the same ability to fund the costs of defending and resolving present and future asbestos claims as Old GP").

To conclude our discussion of jurisdiction, the Court notes that Claimant Representatives appear to be using their jurisdictional arguments as a back-door way to challenge the propriety of the reorganization and the merits of a yet-to-be-filed chapter 11 plan. This is both premature and improper.

If the claimants are adversely affected monetarily by the ongoing bankruptcy, then the time and place to raise that concern is at plan confirmation, not by a purported jurisdictional challenge that really goes to the merits of the reorganization. At plan confirmation, claimants holding "at least two-thirds in amount and more than one-half in number of the allowed claims of such class" must accept the plan for the bankruptcy court to confirm it (with some exceptions not relevant here). 11 U.S.C. § 1126(c); *id.* § 1129(a)(7)–(8). Therefore, Bestwall must propose a plan that addresses the concerns held by a majority of the claimants. This mandatory reality of chapter 11 bankruptcy belies the dissent and Claimant Representatives' false narrative that some subterfuge will befall the claimants.

Alternatively, rather than waiting for plan confirmation, claimants can bring individual actions for relief based on the specific facts of a particular claim. That is done in bankruptcy proceedings on a routine basis where appropriate. Notably, Claimant Representatives have failed to do so here.

These bankruptcy procedures promote the equitable, streamlined, and timely resolution of claims in one central place compared to the state tort system, which can and

has caused delays in getting payment for legitimate claimants. *Compare Katchen v. Landy*, 382 U.S. 323, 328 (1966) (explaining that "a chief purpose of the bankruptcy laws is to secure a prompt and effectual administration and settlement of the estate of all bankrupts within a limited period" (cleaned up)), *with* Oral Argument at 33:23–33:50 (Bestwall's counsel explaining that when Bestwall filed for bankruptcy in 2017, of the 64,000 pending asbestos-related claims, seventy-five percent had been pending for ten years or more, and fifty-five percent had been pending for fifteen years or more). In fact, while Claimant Representatives complain that the over four-year preliminary injunction proceeding has impeded the resolution of asbestos-related claims, the main interference with the timely resolution of the claims in Bestwall's bankruptcy proceeding appears to be Claimant Representatives' challenge to the preliminary injunction, thereby prolonging the bankruptcy process and preventing the claimants from obtaining prompt relief. It is not clear why Claimant Representatives' counsel have relentlessly attempted to circumvent the bankruptcy proceeding, but we note that aspirational greater fees that could be awarded to the claimants' counsel in the state-court proceedings is not a valid reason to object to the processing of the claims in the bankruptcy proceeding.

The district court thus correctly rejected the Claimant Representatives' argument that Old GP, Bestwall, and New GP improperly manufactured jurisdiction.

## IV.

Finally, we consider the merits of the preliminary injunction. The Claimant Representatives argue that even if the bankruptcy court properly exercised jurisdiction over

the claims against New GP, the bankruptcy court should not have granted the preliminary injunction because it (1) engaged in the wrong legal inquiry by focusing on the likelihood of reorganization rather than on the likelihood of the court confirming a plan that included a *permanent* injunction, and (2) applied the wrong standard by focusing on the *realistic possibility* of reorganization instead of requiring a *clear showing* of a successful reorganization. Again, we disagree.

First, in order to grant a preliminary injunction, courts must evaluate, *inter alia*, whether the plaintiff is likely to succeed on the merits. *Mountain Valley Pipeline v. W. Pocahontas Props.*, 918 F.3d 353, 366 (4th Cir. 2019). Normally, the "merits" in litigation are the resolution of an underlying civil dispute. But in a chapter 11 bankruptcy, the focus is not on resolving a particular dispute but rather on the debtor's rehabilitation and reorganization. *See In re White Mountain Mining Co., L.L.C.*, 403 F.3d 164, 170 (4th Cir. 2005) (explaining that the purpose of chapter 11 is the "rehabilitation of the debtor"); *Providence Hall Assocs. Ltd. P'ship v. Wells Fargo Bank, N.A.*, 816 F.3d 273, 279 (4th Cir. 2016) (same); *In re Premier Auto. Servs., Inc.*, 492 F.3d 274, 284 (4th Cir. 2007) ("The purpose of Chapter 11 reorganization is to assist financially distressed business enterprises by providing them with breathing space in which to return to a viable state." (citation omitted)); *see also Carolin Corp.*, 886 F.2d at 702 (suggesting that chapter 11's purpose is "to reorganize or rehabilitate an existing enterprise" (citation omitted)). Therefore, as our sister circuits have stated explicitly, the "merits" that must be considered for purposes of a preliminary injunction in a chapter 11 bankruptcy case are the debtor's rehabilitation and reorganization. *See In re Excel Innovations, Inc.*, 502 F.3d 1086, 1095 (9th Cir. 2007)

(holding that an injunction under § 105(a) requires "a reasonable likelihood of a successful reorganization"); *In re Eagle-Picher Indus., Inc.*, 963 F.2d 855, 860 (6th Cir. 1992) (indicating that the likelihood-of-success factor requires a "realistic possibility of successfully reorganizing"); *see also Piccinin*, 788 F.2d at 1008 (affirming grant of preliminary injunction and focusing on whether "*any effort at reorganization of the debtor will be frustrated*, if not permanently thwarted" should the third-party litigation proceed (emphasis added)); *Willis v. Celotex Corp.*, 978 F.2d 146, 149 (4th Cir. 1992) (indicating that a § 105(a) injunction is appropriate, *inter alia*, if third-party proceedings "will have an adverse impact on the Debtor's *ability to formulate a Chapter 11 plan*" (emphasis added) (quoting *Piccinin*, 788 F.2d at 1003)). The bankruptcy court thus appropriately considered Bestwall's realistic likelihood of successfully reorganizing when granting an injunction under § 105(a).

The Claimant Representatives assert that, under the first prong of the preliminary injunction test, the district court should have determined whether Bestwall would ultimately be able to obtain permanent injunctive relief. But requiring a party to show entitlement to a permanent channeling injunction this early in the bankruptcy proceeding puts the cart before the horse; § 524(g) does not require such proof until the plan confirmation stage. *See* 11 U.S.C. § 524(g)(1)(A) (providing that "[a]fter notice and hearing, *a court that enters an order confirming a plan of reorganization* under chapter 11 *may issue, in connection with such order, an injunction*" (emphasis added)). Contrary to the express intent of Congress as shown through the Bankruptcy Code, the position of Claimant Representatives would effectively eliminate reorganization under chapter 11 as

26

an option for many debtors. Therefore, we reject the Claimant Representatives' argument that the bankruptcy court needed to find that it would likely enter a permanent injunction in order to grant a preliminary injunction.

Further, the Claimant Representatives assert that the preliminary injunction standard requires a "clear showing" that the debtor will be able to reorganize rather than the "realistic possibility" standard applied by the bankruptcy court. Opening Br. 50. But the cases on which the Claimant Representatives rely in support of their argument were decided outside the context of a preliminary injunction in bankruptcy and are thus inapposite. *See, e.g.*, *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (holding—outside the context of a § 105(a) injunction—that a party seeking a preliminary injunction must make a clear showing that he or she is entitled to such relief). Moreover, if we required a "clear showing" of a debtor's ability to reorganize before the plan-confirmation stage, chapter 11 proceedings would never get off the ground, as we just noted. For example, the debtor would have to provide significant evidence that it would be able to reorganize before the entry of the preliminary injunction necessary to make such a reorganization possible. *See In re Hillsborough Holdings Corp.*, 123 B.R. 1004, 1015 (Bankr. M.D. Fla. 1990) ("There is nothing in this record to indicate that these Debtors are not viable business entities incapable of achieving a successful reorganization which is fair and equitable to all. Their success is, however, dependent on a speedy, favorable determination of the issues raised by the Debtors in [their] Adversary Proceeding . . . . Thus, until those matters are resolved, it would be premature to conclude at this time that

this reorganization process is doomed and that there is no legal justification for granting the injunctive relief sought.").

For all these reasons, we affirm the district court's decision affirming the bankruptcy court's order granting a preliminary injunction.

V.

For the foregoing reasons, we

*AFFIRM.*

28

KING, Circuit Judge, dissenting in part:

The Supreme Court has long recognized that Congress's "central purpose" in enacting the Bankruptcy Code was to "provide a procedure by which certain *insolvent debtors* can reorder their affairs, make peace with their creditors, and enjoy a new opportunity in life with a clear field for future effort." *See Grogan v. Garner*, 498 U.S. 279, 286 (1991) (emphasis added). Put differently, the nation's bankruptcy laws "must be construed . . . to give *the bankrupt* a fresh start." *See Burlingham v. Crouse*, 228 U.S. 459, 473 (1913) (emphasis added); *see also Williford v. Armstrong World Indus.*, 715 F.2d 124, 126 (4th Cir. 1983) (explaining that the relief afforded by Chapter 11's automatic stay "belongs exclusively to the 'debtor' in bankruptcy"). Yet in recent years, major and fully solvent business corporations have managed to skirt that debtor-centric objective and obtain shelter from sweeping tort litigation without having to file for bankruptcy themselves. It is precisely that sort of manipulation of the Bankruptcy Code — and by extension the Article I bankruptcy courts — that lies at the heart of this important appeal.

Parting ways with my friends in the majority, I would reverse the judgment of the district court and remand for that court to vacate the bankruptcy court's order enjoining asbestos-related lawsuits against New GP.[1] A non-debtor codefendant of debtor Bestwall,

---

[1] In keeping with the majority opinion, I refer to Georgia-Pacific as it existed prior to the company's 2017 restructuring as "Old GP," and to the company as it currently exists as "New GP." Meanwhile, "Bestwall" refers simply to Georgia-Pacific's corporate subsidiary that is the debtor in the Chapter 11 bankruptcy proceedings at issue here. Finally, I also adopt the majority's use of "Claimant Representatives" to refer collectively to the Official Committee of Asbestos Claimants and the Future Claimants' Representative.

New GP is among the world's largest manufacturing firms, and — by its own account — has every ability to defend against continued asbestos litigation and to satisfy all resulting liabilities. Nevertheless, Old GP, Bestwall, and New GP manufactured the jurisdiction of the bankruptcy court in these proceedings, in an unmistakable effort to gain leverage over future asbestos claims against New GP.

Through their creative use of the so-called "Texas divisional merger" and the creation of unorthodox contractual relationships between Bestwall and New GP, the three Georgia-Pacific entities ran afoul of the foundational principle that parties may not artificially construct a federal court's jurisdiction — especially that of a federal bankruptcy court, which possesses particularly limited jurisdiction. And with that being so, the bankruptcy court below was unable to act under any "related-to" jurisdiction that it could theoretically have been vested with under 28 U.S.C. § 1334(b). Moreover, the bankruptcy court also lacked "arising-in" jurisdiction with which to enjoin the New GP asbestos litigation. For those reasons, and as more fully explained herein, I respectfully dissent from the majority's affirmance of the district court's ratification of the bankruptcy court's injunction.[2]

---

[2] I readily concur in the majority's threshold determination that appellant Sander L. Esserman, in his capacity as the Future Claimants' Representative, possesses appellate standing to challenge the bankruptcy court's award of injunctive relief. Accordingly, I am dissenting from the majority opinion in substantial part, though not in full.

I.

A.

For the most part, I take no issue with the majority's recitation of the relevant facts. I will emphasize, however, some of the more striking and understated details of Georgia-Pacific's history of asbestos litigation and the origins of these bankruptcy proceedings. Owing to its extensive use of asbestos in commercial products such as joint compound and certain industrial plasters, Georgia-Pacific has faced many hundreds of thousands of asbestos-related personal injury lawsuits since at least 1979 — the vast majority of which have been filed by individuals suffering from the scourge of mesothelioma. Georgia-Pacific stands as one of the most frequently sued defendants in this Country's tide of asbestos litigation, having spent more than $2.9 billion defending against such claims. And Georgia-Pacific has acknowledged that thousands of additional asbestos claims will be filed against it each year for decades yet to come.

Those financial strains notwithstanding, Georgia-Pacific has remained a fully solvent, multibillion-dollar business leader in the pulp and paper industry. Indeed, New GP — Georgia-Pacific's current corporate form and the inheritor of the bulk of Old GP's assets — represented to the bankruptcy court in the proceedings below that its assets are fully "sufficient to satisfy" the Old GP asbestos liabilities that have been assigned to Bestwall. *See* J.A. 596.[3] Nevertheless, by reason of the bankruptcy court's injunction,

---

[3] Citations herein to "J.A. __" refer to the contents of the Joint Appendix filed by the parties to this appeal.

31

New GP's evidently bountiful assets are now out of reach for any and all asbestos claimants seeking relief through our Nation's tort system, in either state or federal court.

Old GP obtained that protection of its assets by deciding to "undertake a corporate restructuring" on July 31, 2017. *See* J.A. 738. On that day, Old GP — then a Delaware corporation — reorganized under the laws of Texas and promptly made use of the Lone Star State's "divisional merger" statute to carve itself into two new entities — Bestwall and New GP.[4] To Bestwall, Old GP assigned virtually all of its existing asbestos liabilities; Bestwall otherwise received minimal assets and no formal business operations. Meanwhile, New GP was entrusted with the lion's share of Old GP's assets, along with its non-asbestos-related liabilities. With Old GP dissolved, New GP resumed its predecessor's status as a Delaware corporation — where it has continued business operations just as Old GP did — while Bestwall was reorganized in North Carolina. Stunningly, Bestwall and New GP existed as Texas business entities for less than five hours.

Bestwall did not hire any employees, engage in any new business ventures, or do much of anything else following its relocation to the Old North State. Instead, on November 2, 2017 — some three months after its inception — Bestwall filed for Chapter 11 bankruptcy in the Western District of North Carolina, securing safe harbor from its inherited asbestos liabilities by virtue of the bankruptcy court's automatic stay. *See* 11

---

[4] As the majority has explained, the validity of Texas's divisional merger statute is not before us in this appeal. *See ante* 5 n.1. And our resolution of that issue is not necessary to determine whether the bankruptcy court possessed jurisdiction to enjoin the New GP asbestos litigation.

U.S.C. § 362(a).  And later that same day, Bestwall initiated an adversary proceeding in the bankruptcy court, by which it sought the entry of a preliminary injunction to shield none other than its sister corporation — New GP — from any current and future asbestos claims.

At the time of its 2017 corporate restructuring, Old GP was well aware that any successor entity holding its productive assets would face continued asbestos liabilities.  It was for that reason that Old GP travelled to Texas in the first instance — to sever its extant liabilities, place them in bankruptcy, and in turn utilize the bankruptcy proceedings to stay future litigation against the remainder of its business operations.  New GP, in other words, was designed to receive bankruptcy protection despite its non-debtor status, with no need to submit to the bankruptcy court's oversight or to suffer the burdens appurtenant to a Chapter 11 filing.  And that is no conjecture — by its adversary complaint, Bestwall freely admitted to the bankruptcy court that the very purpose of Old GP's 2017 restructuring was "to provide [Bestwall] with the option to seek a resolution of the asbestos claims in [the bankruptcy court] under section 524(g) of the Bankruptcy Code, without subjecting the entire Old GP enterprise to a chapter 11 reorganization."  *See* J.A. 399.  Later in the bankruptcy proceedings, Bestwall and New GP clarified that "[Bestwall's] goal" in filing for Chapter 11 protection was, in part, to obtain "an injunction . . . that will permanently protect [Bestwall] *and its affiliates* from any further asbestos claims" related to products manufactured and sold by Old GP.  *Id.* at 603 (emphasis added).

Bestwall quickly achieved its goal.  After concluding that any asbestos lawsuits pursued against New GP would be sufficiently "related to" Bestwall's bankruptcy estate to

bring some "effect" to bear on the estate, the bankruptcy court entered the requested preliminary injunction, thereby shielding "the entire Old GP enterprise" from all civil liability. Today, then, asbestos claimants are left without any ability to seek relief for their afflictions from Georgia-Pacific — or its corporate affiliates — in the tort system. And of course, many of those claimants have and will continue to run out of time, their years cut short by asbestos-related disease while these bankruptcy proceedings grind on.

B.

Importantly, Georgia-Pacific is not alone in utilizing Texas's divisional merger statute to isolate its unwanted asbestos liabilities in bankruptcy without having to subject the whole of the corporate entity to Chapter 11 proceedings. Perhaps most notably, after facing a "torrent of lawsuits" alleging that its signature baby powder contained traces of asbestos, New Jersey-based Johnson & Johnson went to Texas in 2021 to restructure into two new entities — "LTL Management" and "Johnson & Johnson Consumer." *See In re LTL Mgmt., LLC*, 64 F.4th 84, 92 (3d Cir. 2023). Just like Bestwall, LTL was assigned all of Johnson & Johnson's existing asbestos-related liabilities. And like Bestwall, LTL promptly filed for bankruptcy. Thereafter, the bankruptcy court extended the reach of the automatic stay of claims against LTL to cover various non-debtor entities, including Johnson & Johnson Consumer.

The majority rightly explains that the Third Circuit's 2023 decision in *LTL Management* concerning the propriety of LTL's bankruptcy petition is distinguishable here — the *LTL* case did not consider or discuss the bankruptcy court's jurisdiction to halt tort claims against a non-debtor. *See ante* 20-22. Ultimately, the court of appeals directed that

34

LTL's petition be dismissed, as the company was never truly in financial distress. That is, pursuant to a funding agreement, LTL actually had the ability to cause Johnson & Johnson Consumer to pay it up to that company's full value to satisfy any asbestos-related liabilities. *See* 64 F.4th 106-10. In any event, while the two bankruptcy cases have charted different paths, the Johnson & Johnson proceedings underscore the very point at issue here — a healthy corporation's placement of a liability-laden subsidiary into bankruptcy in order to avoid Chapter 11 reorganization for the balance of the healthy company is not guaranteed to result in smooth sailing.

## II.

With the foregoing in mind, I would reverse the judgment below and remand for the district court to vacate the bankruptcy court's order awarding injunctive relief, insofar as the bankruptcy court was not clothed with any jurisdiction permitting the entry of such an order. To the extent that the bankruptcy court was facially vested with "related-to" jurisdiction under 28 U.S.C. § 1334(b) — as that court, the district court, and my good colleagues in the majority have all concluded — that jurisdiction was fabricated by way of Old GP's restructuring in Texas and the imposition of the various contractual obligations between Bestwall and New GP. And because civil claims brought against New GP by private individuals have their genesis outside of Bestwall's bankruptcy proceedings, the bankruptcy court could not have alternatively grounded its order enjoining those claims in

"arising-in" jurisdiction under § 1334(b).  Accordingly, the injunction as to the New GP

asbestos litigation is without any lasting legal weight.[5]

A.

1.

As a general rule, bankruptcy courts — which by federal law are courts of limited

jurisdiction — may not intervene in or otherwise halt civil litigation between non-debtors.

*See In re Prescription Home Health Care, Inc.*, 316 F.3d 542, 547 (5th Cir. 2002).  In

certain situations, however, a bankruptcy court may assert "related-to" jurisdiction over

matters outside of a particular debtor's bankruptcy proceedings, where the disposition of

those matters may have some conceivable "effect" on the debtor's bankruptcy estate.  *See

A.H. Robins Co. v. Piccinin*, 788 F.2d 994, 1002 n.11 (4th Cir. 1986) (citing *Pacor, Inc. v.

Higgins*, 743 F.2d 984, 994 (3d Cir. 1984)); *see also* 28 U.S.C. § 1334(b) (affording district

— and bankruptcy — courts jurisdiction to hear proceedings "arising in or related to cases

under title 11").  As the majority points out, the *Pacor* "effects" test for "related-to"

jurisdiction followed in our Court is purposefully broad — and, to be sure, the majority

identifies multiple possible ways that asbestos claims brought against New GP could

"affect" Bestwall's bankruptcy estate.  That matters not, however, if the entire factual basis

for invoking the bankruptcy court's "related-to" jurisdiction was contrived.

---

[5] Because the bankruptcy court lacked any jurisdiction under 28 U.S.C. § 1334(b) with which to enjoin the asbestos litigation against New GP, I would not reach the question of whether the court applied the correct legal standard in granting Bestwall's request for a preliminary injunction pursuant to 11 U.S.C. § 105(a).

36

Pursuant to 28 U.S.C. § 1359, a federal court will lack jurisdiction over any action "in which any party . . . has been improperly or collusively made or joined to invoke the jurisdiction of such court." Congress intended § 1359 to guard against "litigants' attempts to manipulate jurisdiction" where none would otherwise exist. *See In re Samsung Elecs. Co.*, 2 F.4th 1371, 1377 (Fed. Cir. 2021). In other words, § 1359 was "designed to prevent the litigation of claims in federal court by suitors who by sham, pretense, or other fiction acquire a spurious status that would allow them to invoke the limited jurisdiction of the federal courts." *See Nolan v. Boeing Co.*, 919 F.2d 1058, 1067 (5th Cir. 1990). And while § 1359's prohibition on manufactured subject matter jurisdiction most frequently arises in the arena of diversity jurisdiction cases proceeding under 28 U.S.C. § 1332, today's majority acknowledges that nothing in the text of § 1359 — nor in interpretive case law — specifies that it does not apply with equal force to bankruptcy proceedings carried out under the auspices of § 1334. *See ante* 18 n.15.

In any event, this Court has routinely emphasized the fundamental principle that no actions of the parties can "create subject matter jurisdiction or waive its absence." *See Orquera v. Ashcroft*, 357 F.3d 413, 416 (4th Cir. 2003). And we have specifically admonished that "neither the parties nor the bankruptcy court can create § 1334 jurisdiction" in any bankruptcy proceeding. *See Valley Historic Ltd. P'ship v. Bank of N.Y.*, 486 F.3d 831, 837 (4th Cir. 2007); *accord In re Combustion Eng'g, Inc.*, 391 F.3d 190, 228-29 (3d Cir. 2004) (recognizing that debtors may not create federal bankruptcy jurisdiction over non-debtor third parties by way of plans of reorganization, consent, or otherwise). Put simply, it is elementary that the debtor in bankruptcy "cannot write its own

jurisdictional ticket" — and it logically follows that the debtor cannot make out such a "ticket" for a distinct, non-debtor entity either. *See Valley Historic*, 486 F.3d at 837.

Yet that is exactly what Old GP did here — it reformed its corporate existence precisely so that its principal successor entity, New GP, could be afforded bankruptcy relief without ever having to file for bankruptcy. Old GP carefully structured the relationship between New GP and its planned vehicle for unwanted liabilities, Bestwall, in such a way as to permit the bankruptcy court to spare New GP from the legal headache of continued asbestos litigation by way of an 11 U.S.C. § 105(a) injunction — extending, for all intents and purposes, the reach of the automatic stay of asbestos claims against debtor Bestwall to those pursued against New GP. But for Old GP's assignment of its asbestos liabilities and its productive business assets and operations to separate successor entities — as well as its brokering of contracts between those entities to create the appearance of their corporate relations being inextricably intertwined — there would have been no "effects" for the bankruptcy court to rely on in resolving that it was vested with "related-to" jurisdiction. Again, Bestwall and New GP do not meaningfully dispute this. Both have acknowledged that Old GP's restructuring and Bestwall's bankruptcy were intended to secure "the issuance of an injunction" that would insulate New GP from asbestos litigation "without subjecting the entire Old GP enterprise to a chapter 11 reorganization." *See* J.A. 399, 603.

In concluding that asbestos claims lodged against New GP might "affect" Bestwall's bankruptcy estate, the bankruptcy court looked primarily to the companies' contractual arrangements. As the court explained, Bestwall was saddled with a series of indemnity obligations to New GP, requiring it to reimburse its sister company for, inter alia, any losses

attributable to continued asbestos lawsuits. That being so, in the court's view, New GP's defense of any asbestos litigation would indirectly deplete the assets available to Bestwall in funding its 11 U.S.C § 524(g) trust — making it such that potential asbestos judgments against New GP would be "tantamount to" judgments against Bestwall's bankruptcy estate. *See* J.A. 741. Separately, the court determined that, in the event of New GP having to defend against new asbestos lawsuits, New GP lawyers temporarily assigned to Bestwall under the companies' secondment agreement would likely be recalled by New GP to aid in litigation defense work. Those lawyers would thus be "distracted" from their work overseeing Bestwall's Chapter 11 proceedings, effectively impairing the efficient administration of Bestwall's bankruptcy estate. *Id.* at 740.

That is all well and good, but despite the Claimant Representatives challenging its jurisdiction to reach outside of the Bestwall proceedings and enjoin asbestos litigation against New GP, the bankruptcy court never addressed or resolved whether the agreements between Bestwall and New GP had simply been devised in order to manufacture the court's ability to afford New GP relief.[6] As the party seeking an injunction and asserting jurisdiction, Bestwall had (and maintains) the burden of proving that the bankruptcy court

---

[6] In response to my dissenting submission, the majority maintains that the bankruptcy court addressed the Claimant Representatives' assertion that bankruptcy jurisdiction had been fabricated. *See ante* 9 n.8. But the court's consideration of whether the indemnity obligations between Bestwall and New GP were "contrived" went only to its narrow conclusion that the entities' funding agreement "acts only as a backstop" (and it certainly does not, *see infra* note 7). *See* J.A. 741. At no point did the court actually evaluate the purpose of the two agreements, and there was simply no analysis of manufactured subject matter jurisdiction. *See id.* at 736-52.

was *properly* — not artificially — vested with subject matter jurisdiction. *See United States v. Poole*, 531 F.3d 263, 274 (4th Cir. 2008) ("A court is to presume . . . that a case lies *outside* its limited jurisdiction unless and until jurisdiction has been shown to be proper."). That is, Bestwall was obliged to demonstrate that Old GP's Texas divisional merger and the development of the contractual relationships between itself and New GP were driven by an independent, legitimate business justification, and that those maneuvers were not "pretextual." *See Toste Farm Corp. v. Hadbury, Inc.*, 70 F.3d 640, 643-44 (1st Cir. 1995). Perhaps unsurprisingly, Bestwall has never offered any substantive explanation along those lines. To the contrary, Bestwall concedes that Old GP's restructuring was specifically intended to shield the corporation's assets without the need for a wholesale declaration of bankruptcy. Accordingly, I readily conclude that Old GP, Bestwall, and New GP together "improperly or collusively made" — from whole cloth — the bankruptcy court's jurisdiction. *See* 28 U.S.C. § 1359. And as a result, the court was without any ability to enter an injunction against the New GP asbestos litigation.

## 2.

Putting aside for the moment the question of jurisdictional manufacturing, the agreements between Bestwall and New GP relied on by the bankruptcy court were arguably not even sufficient to establish the court's "related-to" jurisdiction. As the Claimant Representatives explain in their briefing, Bestwall's supposed indemnity obligations to New GP are in fact wholly circular, essentially a legal fiction. Pursuant to the entities' funding agreement, Bestwall is entitled to obtain *from* New GP "the funding of any obligations of [Bestwall] owed to [New GP] . . . including, without limitation, any

40

indemnification or other obligations of [Bestwall]." *See* J.A. 337. In other words, to satisfy a claim for indemnity from New GP relating to its defense of asbestos claims, Bestwall would obtain the necessary cash from New GP itself. Any potential asbestos judgments against New GP would therefore not be "tantamount to" judgments against Bestwall — there is no indication that litigation against New GP would impair or otherwise "affect" the valuation of the bankruptcy estate at all. *Id.* at 741.[7]

As to the "effects" of the potential "distraction" of New GP personnel who have been "seconded" to Bestwall, the secondment agreement specifies that "Provider [New GP] shall not remove any of the Seconded Employees from Recipient [Bestwall], unless

_____

[7] Bestwall and New GP insist that the funding agreement is not "contrived" or "circular," insofar as, by the agreement's terms, Bestwall's ability to seek funding from New GP for its indemnity obligations only kicks in "to the extent that any cash distributions theretofore received by [Bestwall] from its Subsidiaries are insufficient to pay such . . . obligations." *See* J.A. 377.

True, that is how the funding agreement reads — but the agreement does not actually function as a "backstop" because it likewise requires Bestwall to utilize "cash distributions . . . from its Subsidiaries" in "the normal course of its business" and to cover all "costs of administering the Bankruptcy Case." *See* J.A. 377. And to date, New GP — by its own admission — has "contributed approximately $150 million under the Funding Agreement" to cover those costs, indicating that distributions from Bestwall's subsidiaries (of which there is apparently only one, a company called "PlasterCo" that the majority hails as a booming business concern) are not sufficient to cover its ordinary business and bankruptcy costs — let alone any additional indemnification costs. *See* Br. of Appellees 9. That being so, it is not conceivable on this record that Bestwall's indemnity obligations to New GP would ever impact its bankruptcy estate, as any and all funding for those obligations will necessarily come out of New GP's pockets.

Finally, it bears emphasizing that New GP actually concedes in its briefing that it contributed $150 million to Bestwall under the funding agreement. *See* Br. of Appellees 9. That payment is thus not at all an "unsupported assertion" or "allegation" of an adversary, as the majority contends. *See ante* 16 n.13.

mutually agreed by Recipient and Provider." *See* J.A. 696.  Bestwall would therefore have to assent to any "effects" of New GP lawyers leaving it behind to defend New GP from asbestos lawsuits — fully undercutting the supposed point in seeking from the bankruptcy court an injunction against such lawsuits.

Perhaps recognizing the hazards in relying on the agreements between Bestwall and New GP as a basis for "related-to" jurisdiction, the majority relegates its discussion of the entities' contractual relations to a footnote, resolving that any "effects" on Bestwall's bankruptcy estate brought about by the agreements are simply not necessary to conclude that the bankruptcy court's exercise of jurisdiction was sound.  *See ante* 16 n.13.  And given its dismissal of the agreements' import, the majority declines to address whether the agreements might reveal the wrongful manufacture of the court's jurisdiction.  *See id.* at 22.

Instead, the majority predicates its jurisdictional determination on the common nature of the tort claims that have been stayed as against Bestwall and those that might be filed against New GP absent an injunction, invoking collateral estoppel and the potential preclusive effect of adverse evidentiary rulings or judgments against New GP.  In that sense, the majority explains, actively litigating against New GP the very same asbestos claims pursued against Bestwall prior to its bankruptcy filing could easily impact the value and administration of the bankruptcy estate.  As the bankruptcy court put it, sanctioning "piecemeal attempts" to hold New GP liable for Bestwall's asbestos liabilities would defeat the bankruptcy filing's "fundamental purpose" of globally resolving those liabilities in one forum.  *See* J.A. 740.

42

Once again, I do not necessarily disagree with the foregoing explanation for why New GP's asbestos litigation might conceivably "affect" Bestwall's bankruptcy estate. But the problem remains that such "effects" would arise *only* because Old GP ensured that they would. That is, Old GP purposefully created privity between its successor entities such that claims against one (the solvent, productive corporation) would necessarily have some impact on the other (the debtor hampered with old liabilities), thereby allowing the bankruptcy court to intervene on New GP's behalf. To the extent that the "effects" of parallel litigation might have permitted the bankruptcy court — on paper — to suspend claims against the non-debtor entity, "Old GP . . . created this situation by placing most of its operations and assets outside the protection of bankruptcy." *See* Reply Br. of Appellants 19. With that being so, the Claimant Representatives explain, "pleas that [Old GP's] legal successor [now] needs bankruptcy protection ring hollow." *Id.*

The majority largely dodges the fact that its chosen basis for "related-to" jurisdiction was also concocted by Old GP, stating briefly and without support that "Old GP clearly could not and did not manufacture" the effects of identical claims pending against New GP outside of Bestwall's bankruptcy proceedings. *See ante* 22. And the majority's only other defense against the problem of manufactured jurisdiction is that, absent the Texas divisional merger, asbestos claims against New GP would have remained claims against Old GP, such that if Old GP had opted to file for Chapter 11 protection, "the bankruptcy court would have had jurisdiction over those claims as it does over the same claims here." *Id.* at 19. But that misses the point entirely, focusing on jurisdiction over claims instead of parties.

43

The issue at hand is instead whether the bankruptcy court could properly exercise jurisdiction over civil proceedings initiated against a non-debtor, third-party entity, which would not currently exist had Old GP not undergone its 2017 restructuring. Removing the divisional merger from the jurisdictional equation thus ignores and avoids the question that we have been called upon to resolve. Certainly, it is obvious that if Old GP had never undergone its divisional merger and had instead filed for bankruptcy itself, the bankruptcy court could have stayed any and all asbestos claims then pending against it. But we are now focused on that court's involvement with New GP. And the majority acknowledges as much, asserting on the one hand that "there is no way to separate the parties from the claims here," but then conceding that "§ 1334(b) requires us to analyze whether the claims *involving New GP* are 'related to' the bankruptcy case." *See ante* 20 (emphasis added). Hypothetical claims against Old GP — now a defunct corporation — simply have no bearing on our jurisdictional inquiry. Put succinctly, if New GP "wished to receive the protections offered by [Chapter 11], it must have filed for bankruptcy." *See Kreisler v. Goldberg*, 478 F.3d 209, 213-14 (4th Cir. 2007).

At bottom, regardless of whether premised on the nature of the agreements between Bestwall and New GP or the impacts of parallel litigation on Bestwall's bankruptcy estate, the bankruptcy court's jurisdiction consistently flows from an orchestrated endeavor to fabricate it. But for Old GP, Bestwall, and New GP's improper efforts in that regard, the court would have lacked any ability to spare New GP from civil liability without a bankruptcy filing. Because — as the majority itself recognizes — "using a strawman, or sham transactions, solely for the creation of otherwise unobtainable jurisdiction . . . is

clearly forbidden," the bankruptcy court in this situation could not legitimately claim to exercise "related-to" jurisdiction in issuing an injunction. *See ante* 20 (quoting *U.S.I. Props. Corp. v. M.D. Constr. Co.*, 860 F.2d 1, 6 (1st Cir. 1988)).

B.

Had it recognized its inability to exercise "related-to" jurisdiction under § 1334(b), the bankruptcy court could have — but opted not to — turn to § 1334(b)'s "arising-in" jurisdiction as a basis for its injunction. As our Court has recognized, proceedings "arising in" Chapter 11 are those that "would have no existence outside of the bankruptcy." *See In re A.H. Robins Co.*, 86 F.3d 364, 372 (4th Cir. 1996).

Here, the district court — after concluding that the bankruptcy court possessed "related-to" jurisdiction — passingly suggested in a footnote that the court might have also claimed "arising-in" jurisdiction, insofar as the issuance of an injunction under 11 U.S.C. § 105(a) "arises only in bankruptcy cases [and] would have no existence outside of a bankruptcy." *See* J.A. 919. Bestwall and New GP have decided to run with that contention on appeal, insisting that the bankruptcy court enjoyed "arising-in" jurisdiction (in addition to "related-to" jurisdiction) because relief under § 105(a) can be pursued only in the context of a bankruptcy case. The majority, for its part, has declined to address the "arising-in" argument, being satisfied that the bankruptcy court possessed "related-to" jurisdiction.

Bestwall and New GP's characterization of "arising-in" jurisdiction, however, dramatically and improperly expands the scope of the bankruptcy courts' authority beyond the legitimate bounds that this and other courts of appeals have recognized. Their "arising-in" theory boils down to an assertion that any request for a § 105(a) injunction would confer

45

the relevant bankruptcy court with jurisdiction over whatever proceedings the debtor seeks to intervene in, no matter how tangentially connected they might be to the bankruptcy case. But that is not the law. *See In re W.R. Grace & Co.*, 591 F.3d 164, 170 (3d Cir. 2009) ("While § 105(a) of the Bankruptcy Code allows a bankruptcy court to issue any order necessary to carry out the provisions of the Code, it does not provide an independent source of federal subject matter jurisdiction."). Section 105(a) is not a magic wand that a debtor can wave to create bankruptcy jurisdiction — to make use of its provisions, a bankruptcy court must have some independent jurisdictional footing.

In any event, it borders on the absurd to suggest that the asbestos litigation Bestwall sought to have enjoined "arose in" its bankruptcy case. Simply stated, personal injury claims brought by private individuals against a distinct, non-debtor corporation cannot and do not "arise" within the confines of another corporate entity's bankruptcy proceedings. By necessity, such third-party litigation will have — at bare minimum — some "existence outside of the bankruptcy," *see A.H. Robins*, 86 F.3d at 372, and "would have existed whether or not the Debtor filed bankruptcy," *see Valley Historic*, 486 F.3d at 836. The bankruptcy court, in other words, rightly passed over § 1334(b)'s provision of "arising-in" jurisdiction, and the court's injunction could not alternatively be affirmed on that jurisdictional basis.

\* \* \*

In sum, I would squarely reject Georgia-Pacific's use of its 2017 restructuring — little more than a corporate shell game — to artificially invoke the jurisdiction of the bankruptcy court and obtain shelter from its substantial asbestos liabilities without ever

having to file for bankruptcy.  The bankruptcy court's injunction was entered without any legitimate jurisdictional basis, and its effects run directly counter to the purposes of the Bankruptcy Code.  In a pending Seventh Circuit case involving the efforts of a corporate subsidiary in Chapter 11 bankruptcy to spare its parent company from continued product liability litigation, a well-reasoned amicus submission explains that "the Bankruptcy Code has increasingly been manipulated by solvent, blue-chip companies faced with mass tort liability" that, "[t]hrough dubious readings of the Bankruptcy Code that Congress never intended . . . have invented elaborate loopholes enabling them to pick and choose among the debt-discharging benefits of bankruptcy without having to subject themselves to its creditor-protecting burdens."  *See In re Aearo Techs., LLC*, No. 22-2606, at 3-4 (7th Cir. Feb. 1, 2023), ECF No. 89.  Such is the essence of these proceedings — and the core of the reason why the district court's judgment should be reversed, the bankruptcy court's injunction vacated, and this matter remanded for further proceedings.

## III.

Because any jurisdiction that the bankruptcy court was vested with under 28 U.S.C. § 1334(b) was improperly manufactured by the parties before it — and as the court's award of injunctive relief contravened the spirit of the Bankruptcy Code — I would reverse the judgment of the district court and remand for that court to vacate the bankruptcy court's injunction.

With great respect for the competing views of my friends in the majority, I dissent in substantial part.